
RECEIVED
JAN 1 2 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| PATRICIA A. WILLIAMS | CIVIL ACTION NO. 05-1747 |
| VS. | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED AND REMANDED.**

### *Background*

Born on June 15, 1953, Patricia A. Williams ("Williams") is a 53-year-old claimant with a high school education. (Tr. 20). Williams has no vocationally relevant past work experience. (Id.).

Williams filed at least three applications for supplemental security benefits prior to the instant application. The date of filing of the first application is unknown, but the record shows that it was medically approved by ALJ Kim Fields on March 20, 1998. Nevertheless, Williams was not awarded benefits in connection with that application because of excess resources. Although the nature of the excess resources is not clear from the record, Williams testified at her administrative hearing that the resources were for her son, who was injured in an accident that is the subject of litigation and who requires 24-hour nursing care. (Tr. 32-33). The medical basis for ALJ Field's' determination of disability is not known.

Williams filed two additional applications after the 1998 application, on December 15, 2000 and February 15, 2002. Both of the foregoing applications were denied for excess resource reasons. It is unclear whether these claims were evaluated for medical disability, although there is no information in the record to indicate that they were.

Williams protectively filed her current application for supplemental security income benefits on August 21, 2002, alleging disability as of February 1, 1985 due to high blood pressure, diabetes, vision problems, and mental problems. (Tr. 20). Her application was denied initially and on reconsideration, and an administrative hearing was held on June 10, 2004. In an opinion dated November 18, 2004, the ALJ found that Williams retains the residual functional capacity to perform work at all exertional levels, applied the Medical-Vocational Grids, and determined that Williams was not disabled. (Tr. 24-25). The Appeals Council denied review, (Tr. 12-14), making the ALJ's decision the final decision of the Commissioner from which Williams now appeals.

### *Assignment of Errors*

Williams raises three errors on appeal: (1) the ALJ failed to properly consider whether she was eligible for reinstatement of benefits; (2) the ALJ erred in failing to properly evaluate the severity of all of her medically determined impairments at Step 2; and (3) the ALJ erred in assessing her residual functional capacity.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

## *Analysis*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that although Williams suffers from the severe impairments of high blood pressure, obesity, and adult-onset diabetes mellitus, she retains the residual functional capacity to perform work at all exertional levels and is, therefore, not disabled. (Tr. 24-25). The ALJ used the Medical-Vocational Guidelines (the "Grids") to make this determination.

After careful consideration of the record, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.

## I. History of Mental Health Impairments[1]

Williams has a long history of mental health treatment and has been diagnosed with schizophrenia. (Tr. 186-95). As early as 1985, Williams reported that she was depressed, had been hallucinating, and was having problems sleeping and with her appetite. (Tr 195).

The ALJ erroneously found that Williams'smedical records "jump from 1985 to January 17, 2001." In fact, Williams received mental health treatment in 1995 as well. On May 18, 1995, Williams was admitted to the University Medical Center Psychiatric Unit after demonstrating a "decreasing ability to care for herself." (Tr. 148). On examination, Williams "appeared to have some mental confusion and "she was oriented to person and place but disoriented to time and situation." On the date of admission, Williams was "unkempt and unclean," her face was "puzzled," and her attitude was "resistant, withdrawn and suspicious." Her posture was withdrawn and she appeared to be catatonic. Williams's sponteneity was decreased, her rate of output was slow, and she exhibited thought-blocking. Williams was

---

[1] Because the undersigned does not conclude that Williams is disabled because of her physical impairments, which include hypertension and diabetes that are well-controlled with medication, a summary of those physical impairments is not included herein.

discharged on May 26, 1995 with a diagnosis of catatonic schizophrenia, sub-chronic with acute exacerbation; personality disorder; morbid obesity; and psycho/social stressors. (Tr. 150). The records reflect that Williams had previously been admitted to the UMC Psychiatric Unit from April 5 through April 12, 1995. (Tr. 148). Furthermore, Williams testified at her administrative hearing that she was hospitalized at Joseph Tyler Mental Health Center for three weeks in 1999, and that a doctor there told her not to work because stress exacerbated her problems. There are no medical records of this 1999 hospital stay.

Records dated January 17, 2001 show that Williams had shortness of breath and panic attacks. She was diagnosed again with schizophrenia and prescribed Loxitane. (Tr. 192).

On October 30, 2002, Michelle B. Andrus, a social worker and Mental Health Program Manager with the Louisiana Department of Social Services reported that Williams continues to suffer from schizophrenia (as well as hypertension, diabetes, and obesity), that she keeps her monthly appointments with her doctors, and that her "illness is controlled with regular medication and individual follow-up." (Tr. 186). Ms. Andrus stated that, presently, Williams is "symptom-free," but noted that her home situation is "stressful." (Id.).

## II.  Reinstatement of Benefits

There is no dispute that on March 20, 1998, ALJ Kim Fields medically approved Williams for disability. (Tr. 19, 80; Government's Brief, Rec. Doc. 9, p.4). Williams contends that, in light of this prior approval, the ALJ should have more thoroughly developed the record to determine whether she is entitled to a reinstatement of benefits under the SSA's Program Operations Manual ("POMS"), Policies SI 02301.201 and SI 02301.205. Williams also contends

that the ALJ should have been required to show medical improvement in order to deny or cease her benefits.

POMS SI 02301.201 states:

A **suspension** of SSI benefits is required when a recipient is not eligible. It is always effective the first day of a month. . . . Generally, a recipient has 12 consecutive months after the effective date of a suspension to have benefits reinstated if he or she is eligible again. A recipient may have more than 12 months to have benefits reinstated when a condition in SI 02301.205B.2 applies.[2]

POMS SI 02301.205 provides that SSI recipients generally have 12 consecutive months after the effective date of a suspension to have benefits reinstated. After the 12-month suspension period ends, a new application may be required to reestablish eligibility unless one of the conditions in SI 02301.205B.2 applies.

The POMS is a policy and procedural manual issued to help clarify the regulations for the Social Security Administration field offices. As the Supreme Court has stated, this publication is merely a guideline for internal use within the Social Security Administration and does not carry the force of law. Schweiker v. Hansen, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (*per curiam*) (concluding that claims manual rules promulgated for claims representatives do not bind the Social Security Administration); Greenspan v. Shalala, 38 F.3d 232, 239 (5th Cir.1994) (POMS manual is not binding because it is an unpublished policy statement; however, the court will do a case-by-case inquiry to consider the proper circumstantial evidence of disability). Therefore, the ALJ was not bound to consider the POMS policies in adjudicating Williams's claim.

---

[2] The policy as cited by Williams is worded slightly differently, but the content and substance of the policy is the same. The version cited herein is taken directly from the SSA's online Policy Information Site.

However, the Regulations, which are binding upon the Commissioner, contain almost identical rules. Under the Regulations, a claimant has 12 months from the date a suspension of benefits began to become eligible and to obtain benefits without filing a new application. 20 C.F.R. §416.1335. A claimant's eligibility for benefits following 12 consecutive months of benefits suspension will be terminated if eligibility cannot be established, starting with the thirteenth month after the suspension began. 20 C.F.R. §416.1334. At that point, a claimant must file a new application to re-establish disability and eligibility. 20 C.F.R. §416. 305.

In his decision, the ALJ notes that Williams was "medically approved" by ALJ Fields on March 20, 1998, but that benefits were not awarded because of "excess resources." (Tr. 19). An SSA Field Office Disability Report dated December 29, 2000 confirms that Williams had a prior filing with a "date and level of last decision" listed as "03/20/98 HEARING." (Tr. 80). Moreover, in the Field Office Disability Report connected to the current application for benefits, the interviewer noted the following:

> This is the 7th time she has filed for SSI. The last two applications were denied for income/resource reasons. Those two applications are included in this folder. A previous application (record 4x6) was medically approved by the ALJ on 3/20/98 but she never received any benefits on that record because that was also denied for income/resources after the ALJ had approved the case for medical reasons. The locations of previous applications (before the two contained in this folder) are unknown.

(Tr. 103).

Based on the foregoing documentation, it is clear that Williams filed a previous application wherein she was medically determined to be disabled, but that because of excess resources, she was not entitled to receive benefits. Williams contends that, because she was found to be medically disabled, she may have fallen under the policy for suspension of benefits

and, pursuant to SI 02301.201, should have had twelve months to regain her eligibility for benefits without having to file a new application. As the Commissioner points out, however, Williams is not entitled to "reinstatement" of benefits because she was never awarded benefits in connection with the 1998 application or any subsequent application. The record shows that Williams continued to be ineligible for benefits because of excess resources in the years following the 1998 application, as evidenced by her December 2000 and February 2002 applications, both of which were denied on the basis of excess resources.

Considering the foregoing, the undersigned concludes that Williams's argument that the ALJ failed to develop the record to determine whether she was entitled to a reinstatement of benefits is without merit. In order for Williams to be considered disabled, she is required to prove such disability on the basis of the pending application.

## II. Severity of Mental Impairments and Residual Functional Capacity

Williams contends that the ALJ failed to properly evaluate the severity of all of her medically-determined impairments at Step 2. Specifically, Williams contends that the ALJ erred in concluding that her schizophrenia is not severe.

In the instant case, the ALJ concluded that Williams's high blood pressure, obesity and adult onset diabetes mellitus are severe "within the meaning of the regulations." (Tr. 22). However, the ALJ found that Williams's history of depression and schizophrenia are in remission with good medical treatment, and that they have caused only mild difficulties in social functioning, concentration, persistence and pace, and activities of daily living. Thus, the ALJ concluded that Williams's mental impairments are not severe. (Id.).

In the Fifth Circuit, courts must adhere to the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5th Cir.1985) in assessing severity of an impairment. In Stone, the Fifth Circuit declared that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment,* and cannot be based on medical severity alone. Moreover, the Fifth Circuit articulated the correct severity standard as:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Stone, 752 F.2d at 1101; Hammond v. Barnhart, 124 Fed.Appx. 847, 852, 2005 WL 548253, *3 (5th Cir. 2005). The court further stated that "[w]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Stone, 752 F.2d at 1106.

Although the ALJ did not make reference to the severity standard set forth in Stone, the undersigned concludes that this fact alone does not require reversal of the ALJ's decision. The ALJ did not stop the disability analysis at Step 2 based upon a finding that Williams does not have a severe impairment. Rather, the ALJ proceeded to the next step in the sequential evaluation to determine whether Williams's impairments affect her ability to work. The ALJ specifically considered all medically determinable impairments, including Williams's mental impairments, beyond Step 2 as required by the regulations. (Tr. 21-23). The Fifth Circuit has declined to extend the Stone decision to cases that were not decided at Step 2 on the basis of non-severity. See, e.g., Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987) (where ALJ concluded that

appellant's hypertension was of "mild medical severity," and proceeded through the sequential evaluation to conclude at the fourth and fifth steps that the appellant could perform past relevant work and a full range of light work, the court held that the ALJ did not apply an incorrect severity standard at Step 2).

The undersigned concludes, however, that there is no substantial evidence to support the ALJ's finding that Williams's mental impairments do not significantly limit Williams from performing work activities. In assessing Williams's RFC, the ALJ stated:

> The [ALJ] finds that the claimant met the burden of proving that high blood pressure, obesity and adult onset mild diabetes mellitus, significantly limits her from performing work activities, but nothing else, including history of schizophrenia and depression.
>
> Accordingly, the [ALJ] has considered the evidence and finds that the claimant has the residual functional capacity to perform work at all exertional levels, even with high blood pressure and obesity.

(Tr. 23). The ALJ then concluded that "the claimant's ability to perform work at all exertional levels is not significantly compromised by her non-exertional limitations and using section 204.00 of the Medical-Vocational Guidelines as a framework for decision-making, the claimant is not disabled." (Tr. 24).

The ALJ's conclusion is erroneous for several reasons. Although the record shows that Williams's schizophrenia is reasonably controlled by medication, it appears that her condition is exacerbated by stress, given that her mental health hospitalizations have occurred after particularly stressful periods in her life. (Tr. 150). Despite this, the ALJ did not order a consultative examination from a mental health professional or re-contact one of her treating physicians to determine whether, given her particular mental impairment, Williams can adjust to

the stress of a job outside the structured environment of her home. The ALJ was required to make such an assessment under Listing 12.03C(2) and (3), which requires:

> C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. *A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;* or
>
> 3. *Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.*

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.03C (emphasis added).

The regulations require that an ALJ review and examine whether a claimant with chronic mental impairments who has a structured environment at home can nevertheless work in an environment that is not similarly structured, to wit:

> **12.00E. Chronic mental impairments.** Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress. We will attempt to obtain adequate descriptive information from all sources that have treated you in the time period relevant to the determination or decision.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.00E. The regulations note that individuals in structured settings in the home may not be able to cope in a workplace setting that is not as structured:

> **F. Effects of structured settings.** Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. *Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.* For these reasons, identical paragraph C criteria are included in 12.02, 12.03, and 12.04. The paragraph C criterion of 12.06 reflects the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.00F.

Williams argues that she has structured her life in such a way as to limit the exacerbations of her schizophrenia. The record shows that Williams lives in a house with thirteen other people, including several of her children, grandchildren, and their spouses. Williams controls her own stress level by taking care of herself and by doing only nominal chores for the other individuals who live in her house. At her hearing, Williams testified that she can "sometimes" prepare her own meals and those of her family, can wash her own clothes, and goes to church on Sundays. (Tr. 36). Williams testified that she does not do the household chores of her family members living with her.

Williams testified that she does not drive and that she has to lie down for an hour or two each day after taking her medications, because they make her dizzy and drowsy. (Tr. 37). Williams takes a variety of medications for her conditions, including Aripiprozole for depression

and schizophrenia; Trazodone for insomnia; Zestril and Norvasc for hypertension; Ketorolac for leg pain; and Metformin and Glipizide for diabetes. (Tr. 146-47).

Given these facts, the ALJ was required under the regulations to determine Williams's ability to function outside of the structured setting of her home. The ALJ erred in failing to make this determination. Nor did the ALJ obtain the testimony of a vocational expert to opine as to whether an individual with Williams's mental impairments can make the transition to workplace activity. This was error.

Considering the foregoing, the undersigned concludes that the ALJ's failure to properly assess Williams's mental impairments and incorporate those impairments into his RFC resulted in a flawed RFC assessment.

## III.   Obesity and Side Effects of Medication

The ALJ also failed to properly assess the impact of Williams's obesity and the side effects of her medications on her ability to do work-related activities.

### *Obesity*

Obesity remains a factor to be considered in determining whether an individual is disabled. Social Security Ruling (SSR) 02-01p states:

> We may also find that obesity, by itself, is medically equivalent to a listed impairment (or, in the case of a child applying under title XVI, also functionally equivalent to the listings). For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. (See question 8 for further discussion of evaluating the functional effects of obesity, including functional equivalence determinations for children applying for benefits under title XVI.)

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.[3]
>
> \* \* \*
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.
>
> \* \* \*
>
> As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

The record shows that Williams is 5 feet 1 inch tall and weighs in excess of 275 lbs. She has been diagnosed with obesity. (Tr. 186). In evaluating her residual functional capacity, the ALJ stated that Williams "met the burden of proving that her obesity significantly limits her from performing work activities," but that she nevertheless "has the residual functional capacity to perform work at all exertional levels, even with high blood pressure and obesity." (Tr. 23).

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity, and he must explain his decision. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). In the instant case, the ALJ concluded specifically that Williams's obesity "significantly limits her from performing work activities," without identifying how and to what degree, yet he nevertheless concluded that she can perform work at all exertional levels. This was clearly erroneous.

---

[3] Social Security Rulings are issued by the Social Security Administration and are based on case decisions made at the administrative levels of adjudication, federal court decisions, Commissioner's decisions, opinions of the Office of the General Counsel, and other policy interpretations of the law and regulations. Although Social Security Rulings do not have the force and effect of the law or regulations, they are binding on all components of the Social Security Administration, in accordance with Section 422.406(b)(1) of the Social Security Regulations No. 22 (20 CFR Part 422), and are to be relied upon as precedents in adjudicating other cases.

In addition to the lack of evidence concerning the effect of Williams's obesity on her ability to perform physical activities, the record is devoid of information concerning the combined effects of her obesity and her other impairments. "The well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'" Loza v. Apfel, 219 F.3d 378, 399 (5th Cir. 2000), citing Fraga v. Bowen, 810 F.2d 1296, 1305 (5th Cir.1987).

### *Side Effects of Medication*

Furthermore, the undersigned concludes that the ALJ erred in failing to properly consider the side effects of Williams's medications on her ability to hold a job in a realistic work setting. As stated previously, Williams takes numerous medications for her many impairments, both physical and mental. Williams testified that these medications make her dizzy and drowsy and require her to lie down for 1-2 hours after she takes them. (Tr. 37).

Social Security Ruling 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. See Brown v. Barnhart, 285 F.Supp.2d 919, 935 (S.D.Tex. 2003), citing SSR 96-7p; see also 20 C.F.R. §§404.1529(c)(3)(iv), 416.929(c)(3)(iv). Pursuant to Social Security Ruling 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication."

Furthermore, the jurisprudence shows that, in order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

After review of the record, the undersigned concludes that the ALJ did not properly consider the side effects of Williams' medications and, therefore, failed to address the important issue of how Williams is supposed to hold a job if the medication she takes requires her to lay down because of drowsiness and dizziness.

## *Conclusion*

Considering the foregoing, it is recommended that the ALJ's decision be **REVERSED AND REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). On remand, the Commissioner shall further develop the record to determine whether Williams's schizophrenia limits her ability to do work outside the home. Particular attention shall be paid to Listing 12.03C(2) and (3), to determine whether Williams has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the

individual to decompensate, or whether she has the ability to function outside a highly supportive living arrangement. In order to develop the record, the ALJ shall determine whether it is proper to re-contact Williams's treating physicians, obtain a consultative medical examination from a qualified psychologist or psychiatrist, and/or obtain the services of a vocational expert to testify at an administrative hearing to determine whether Williams can make the adjustment to work outside the home. Finally, Williams shall be afforded the opportunity to submit additional evidence in support of her claim.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal**

conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana on January 12, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

COPY SENT:
DATE: 1/12/07
BY: CW
TO: RM
MEM